## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BRIAN GROSS, *individually and on behalf of those similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant. | CASE NO. **0:24-cv-02269**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Brian Gross ("Plaintiff"), by and through his attorneys, brings the following Class Action Complaint on behalf of himself and the Classes set forth below and states as follows:

### INTRODUCTION

1. Plaintiff brings this Complaint against one of the national "Big 3" consumer reporting agencies ("CRAs")—Experian Information Solutions, Inc. ("Defendant")—for violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA"). This case is about the unlawful opening of credit accounts by BLST Operating Company, LLC dba Fingerhut ("Fingerhut") in the spring of 2022 and Defendant's reporting of those unlawful accounts.

2. Fingerhut is a mail order/ online retailer that markets itself to people with poor or no credit histories, and encourages its customers to build their credit by buying products from Fingerhut with Fingerhut's credit accounts.

3. In April 2022, Fingerhut opened thousands of new accounts for its customers who at the time had accounts at Fingerhut (and also closed the previous accounts), without first obtaining those customers' permission to do so. The previous accounts are known as "Fingerhut Advantage" accounts and the new accounts that Fingerhut unlawfully opened are known as "Fingerhut Fetti" accounts.

4. Fingerhut's stated reason for opening the Fingerhut Fetti accounts was that it was "required" to issue a "new credit account" "because [Fingerhut's] agreement with [Fingerhut's] current financing partner is ending."

5. For thousands of impacted consumers, Fingerhut reported to Experian, Equifax, and TransUnion (1) that each consumer's Fingerhut Advantage account weas "closed" and (2) the Fingerhut Fetti account as a new account and separate tradeline for the consumer, with a date opened of April 2022.

6. These actions damaged consumers' credit scores, and created the inaccurate impression that the consumers had authorized the opening of a new Fingerhut Fetti accounts in the spring of 2022.

7. Defendant was aware that Fingerhut was reporting the opening of thousands of new Fingerhut Fetti accounts while simultaneously reporting the closing of thousands of Fingerhut Advantage accounts. Yet, despite this suspicious activity, Defendant did not do anything to ensure that the new Fingerhut Fetti accounts were opened with authorization. Instead, Defendant followed a policy of leaving the accuracy of its credit reporting entirely its paying customers—even when Defendant has actual knowledge that the reporting is suspect or unreliable. The FCRA requires Defendant to do more.

8. Despite receiving numerous disputes from consumers that the Fingerhut Fetti accounts were opened without permission, Defendant refused to meaningfully reinvestigate the disputes and continued reporting the new accounts. In so doing, Defendant willfully violated the FCRA.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 15 U.S.C § 1681p.

10. The Court has personal jurisdiction over Defendant because Defendant conducts business in this District, including issuing consumer reports on Plaintiff and other residents, and delivering such reports to creditors in this District.

11. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

12. Plaintiff Brian Gross is a natural person who resides in Le Sueur, Minnesota and is a "consumer" protected by the FCRA.

13. Defendant does business throughout the United States, including in Minnesota.

14. Defendant is a consumer reporting agency as defined by the FCRA because, for monetary fees, it regularly engages in whole or in part in the practice of assembling and/or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to creditors, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

3

## BACKGROUND

### The FCRA

15. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001).

16. One of these measures, 15 U.S.C. § 1681e(b), requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). This provision imposes a "very high standard" on consumer reporting agencies. *Andrews v. TRW, Inc.*, 225 F.3d 1063, 1068 (9th Cir. 2000), reversed on other grounds, *TRW Inc. v. Andrews*, 534 U.S. 19 (2001).

17. The FCRA also permits consumers to dispute the accuracy of their reports, and requires the consumer reporting agency to thereafter reinvestigate the reporting. 15 U.S.C. § 1681i(a). The reinvestigation obligation is stringent and requires the consumer reporting agency to do more than simply "parrot" back what a furnisher provides to it. *Cushman v. Trans Union Corp.,* 114 F.3d 220, 225 (3d Cir.1997).

### Credit Reporting and Scoring

4

18. A credit score is a score generated by applying a scoring algorithm to the information contained in a credit report. The credit scoring industry is dominated by the Fair Isaac Corporation ("FICO"). Most FICO scores are on a scale from 300–850.

19. Credit scores greatly impact both whether lenders will offer credit at all, and if they will, the terms on which they will do so. Consumers with higher credit scores receive higher credit limits at lower interest rates.

20. FICO scores are the predominant credit scores used by lenders. FICO has released guidance about what can affect consumers' credit scores. Per FICO, FICO takes into account the following:

- 35% Payment history
- 30% Amounts owed
- 15% Length of credit history
- 10 % New credit
- 10% Credit mix[1]

21. Opening a new account can have a significant effect on one's credit score. As explained by FICO:

> New accounts will lower your average account age, which will have a larger effect on your FICO Scores if you don't have a lot of other credit information. Even if you have used credit for a long time, opening a new account can still lower your FICO Scores.[2]

---

[1] https://www.myfico.com/credit-education/whats-in-your-credit-score (last visited April 9, 2024).
[2] https://www.myfico.com/credit-education/credit-scores/new-credit (last visited April 9, 2024).

5

22. FICO thus advises that consumers should "carefully consider if you need a new credit account."[3]

23. Defendant knows that reporting of a new account can harm a consumer's credit score, and in fact has taken steps to try to ensure that consumers with long-standing accounts do not suffer a drop in score when an account is transferred.

24. Defendant (through the trade group the Consumer Data Industry Association ("CDIA")) created a uniform reporting standard, METRO 2 Format, by which consumer data is furnished electronically to the credit bureaus from their customers—"furnishers" such as Fingerhut.

25. The CDIA publishes guidance called the Credit Resource Reporting Guide ("CRRG").

26. One piece of information that creditors provide to the credit bureaus is the date an account was originally opened, known as the "Date Opened" field. The CRRG advises data furnishers that the "original Date Opened" for a credit account should be retained "regardless of future activity, such as transfer, refinance, lost or stolen card, etc."

27. Thus, it is a typical practice in the credit industry that when an account is transferred or transitioned, creditors will report a single account with an integrated payment history and a Date Opened for when the initial account was first opened.

**Fingerhut Opens Thousands of Accounts Without Authorization**

28. In March 2022, Fingerhut sent an advisory out to its customers, telling them

---

[3] https://www.myfico.com/credit-education/credit-scores/new-credit (last visited April 9, 2024).

that because Fingerhut's financing partner had changed, Fingerhut customers could no longer use their Fingerhut Advantage account, and instead would have their account "transitioned" to a Fingerhut Fetti account. These Fingerhut Fetti accounts were created automatically for customers in good standing "as a business formality."

29. The Fingerhut Fetti accounts had the same credit limit as the Fingerhut Advantage accounts and had the same 10-digit customer numbers. Per Fingerhut, the Fingerhut Fetti account was designed to "offer you the same benefits as you had with your Fingerhut Advantage credit account."[4]

30. Fingerhut did not provide consumers with any apparent option to not open a Fingerhut Fetti account.

31. After Fingerhut opened the Fingerhut Fetti accounts, it began reporting two separate tradelines: a tradeline for the Fingerhut Advantage account and a tradeline for the Fingerhut Fetti account. The Fingerhut Fetti account was reported with a Date Opened in March 2022 (which was later changed to April 12, 2022).

32. For thousands of consumers, Fingerhut reported the opening of the Fingerhut Fetti account and the closing of the Fingerhut Advantage account at or around the same time.

33. Without any meaningful review, Defendant then began including both tradelines on credit files and reports, and disseminated the inaccurate information to consumers' potential creditors.

---

[4] https://www.fingerhut.com/content/faqs-fetti (last visited April 9, 2024).

34. This reporting was inaccurate. Consumers had not authorized Fingerhut to authorize the opening of a new credit account. Thus it was inaccurate to report the Fingerhut Fetti at all.

35. The Fingerhut Fetti accounts never should have been reported. At the very least, any reporting of these accounts should have (1) indicated that the accounts were a continuation of the prior Fingerhut Advantage accounts and (2) reported a "Date Opened" with the opening date for the Fingerhut Advantage accounts.

**Plaintiff's Experience**

36. Plaintiff Brian Gross opened a Fingerhut account in October 2011 and diligently paid it off for years, making on-time payments. He opened a Fingerhut account in order to improve his credit and relied on Fingerhut's statements that an account with Fingerhut could improve his credit.

37. In the spring of 2022, Fingerhut closed Plaintiff's Fingerhut Advantage account and opened a new Fingerhut Fetti account. The new Fingerhut Fetti account was reported with an account Date Opened of March 2022 and later changed to April 12, 2022.

38. At no point did Plaintiff provide permission for Fingerhut to open a new account for him.

39. On May 5, 2022, Plaintiff received an alert that a new Fingerhut Fetti account had been opened and was appearing on his credit report. On the same day, he received an alert that his FICO score had dropped by 25 points. A further alert stated that his credit score had dropped because "the date you opened your oldest bankcard or credit card account is too recent."

40. Believing that his identity had been stolen and that someone had fraudulently opened a new Fingerhut Fetti account in his name, Plaintiff was alarmed and immediately disputed his report with the three credit bureaus, including Defendant.

41. In or around May 2022, Plaintiff submitted a dispute to Defendant challenging the reporting of the Fingerhut Fetti account. However, Defendant refused to change its reporting in response to the dispute.

42. In July 2022, Plaintiff submitted the following dispute to Defendant:

> I am writing to dispute my credit report. I have had an account with Fingerhut since October 17, 2011. In March 2022, Fingerhut apparently transitioned my account to a WebBank/Fingerhut Fetti Credit Account. I did not request or control any aspect of this transition and can no longer use my prior account. There are now two Fingerhut accounts showing on my credit report.
>
> The Fingerhut Fetti account inaccurately states that the date opened for the account is March 22, 2022. This is incorrect. I did not open a new account with Fingerhut in March 2022. The date opened should be October 17, 2011. I am concerned that having a recently opened account will affect my credit score. I am disputing the date opened for the Fingerhut Fetti account.
>
> From what I understand, it appears that Fingerhut transitioned many accounts to a Fingerhut Fetti account in March 2022. I don't think that the inaccuracy in my report is an isolated incident. I am therefore requesting that all reporting of Fingerhut Fetti accounts be reinvestigated and corrected.

43. Defendant has received similar disputes from other consumers, challenging its reporting of the Fingerhut Fetti accounts.

44. Defendant did not engage in any reasonable reinvestigation of such disputes, including Plaintiff's. Instead, Defendant simply forwarded the disputes to Fingerhut, which did not meaningfully change its reporting of the Fingerhut Fetti accounts.

9

45. Indeed, in July 2022, Defendant made no changes in response to Plaintiff's dispute. The Fingerhut Fetti account was not removed, nor was the Date Opened on the Fingerhut Fetti account changed to the date that the Fingerhut Advantage account was opened. Defendant similarly stood by its inaccurate reporting for other consumers who disputed.

46. Thus, at a minimum, as of September 1, 2022, Defendant was on unequivocal notice that Fingerhut had reported thousands of accounts inaccurately and Defendant still did not adequately reinvestigate or correct any credit reporting.

47. Defendant's inaccurate reporting has falsely portrayed Plaintiff as opening an account that he never opened, inaccurately portrayed his credit history, and caused him anxiety, worry, and frustration about the information being disseminated to his potential creditors.

48. Defendant has disseminated Plaintiff's consumer report containing inaccurate information to, at least, First Tech Federal Credit Union on or around October 13, 2023 and JPMCB Card on or around August 9, 2023.

**Defendant Did Not Have a Basis to Presume Fingerhut's Reporting Was Accurate**

49. Defendant reported that Fingerhut opened thousands of accounts at or around the same date without performing any inquiry as to whether (1) consumers had authorized the opening of these accounts and (2) Fingerhut's credit reporting, including the date that the accounts were unlawfully opened, was appropriate.

50. Even prior to the reporting of thousands of new accounts, Defendant had

10

never established that Fingerhut was a reliable source in the reporting of credit information. In accordance with its reporting procedures, Defendant followed a policy of not vetting, examining, reviewing, or reasonably investigating the reporting provided to it by Fingerhut.

51. Defendant is aware or should have been aware that it is unusual for a furnisher such as Fingerhut to report the opening of thousands of new accounts on the same date.

52. When Fingerhut opened thousands of accounts at the same time while closing thousands of other accounts, it was unreasonable for Defendant to assume that Fingerhut's reporting was accurate and to report such information without any further review or inquiry.

53. It was further unreasonable and illegal for Defendant to continue reporting such information despite the fact that Defendant had received disputes challenging Fingerhut's reporting.

54. Instead of conducting a meaningful reinvestigation of the reporting as required by the FCRA, Defendant merely passed along the disputes to Fingerhut and accepted Fingerhut's automated "verification" of the disputes at face value.

55. Fingerhut has been sued at least 50 times related to inaccurate credit reporting and Defendant has been a co-defendant in many of these actions.

56. In addition to the conduct set forth above, Defendant's willful conduct is further reflected by, among other things, the following:

- Defendant is a corporation with access to legal advice through its own

general counsel's office and outside litigation counsel. Yet, there is no contemporaneous evidence that it determined that its conduct was lawful;

- Defendant knew or had reason to know that its conduct was inconsistent with FTC guidance, caselaw, and the plain language of the FCRA. It does not comport with Defendant's obligations under the FCRA to report thousands of new accounts opened on the same day without doing any investigation or reinvestigation as to why those accounts are being opened.

- Defendant voluntarily ran a risk of violating the law which was substantially greater than the risk associated with a reading that was merely careless;

- Defendant knew that reporting new tradelines would harm consumers' credit, yet persisted in doing so; and

- Defendant's violations of the FCRA were repeated and systematic.

57. At all times relevant hereto, Defendant's conduct was willful and carried out in knowing or reckless disregard for consumers' rights under the FCRA. Defendant's conduct was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that consumers have disputed; and Defendant will continue to engage in this conduct because it is more expensive to comply with the FCRA rather than not comply.

## CLASS ACTION ALLEGATIONS

58. Plaintiff brings his claims on behalf of the following Classes pursuant to Fed. R. Civ. P. 23:

**Reasonable Procedures Class**
All individuals in the United States for whom (1) Fingerhut automatically transitioned Fingerhut Advantage accounts to Fingerhut Fetti accounts and (2) Defendant disseminated a consumer report to a third party at a time where Fingerhut was reporting both a Fingerhut Advantage and Fingerhut Fetti account.

**Failure to Reinvestigate Class**
All individuals in the United States for whom (1) Fingerhut automatically transitioned Fingerhut Advantage accounts to Fingerhut Fetti accounts and (2) on or after September 1, 2022, Defendant disseminated a consumer report to a third party at a time where Fingerhut was reporting both a Fingerhut Advantage and Fingerhut Fetti account.

## Class Certification is Appropriate

59. The Classes satisfy the requirements of Fed. R. Civ. P. 23 as there is a well-defined community of interest in the litigation and the proposed Classes are ascertainable from Defendant's records and records of third parties, including Fingerhut.

60. The Class members are so numerous that joinder of all is impractical. The names and addresses are identifiable through documents maintained by Defendant and third parties, and they may be notified of the pendency of this action by published and/or mailed notice.

61. Plaintiff's claims are typical of the claims of each Class member. The violations suffered by Plaintiff are typical of those suffered by other putative Class members, and Defendant treated the Plaintiff consistently with other putative Class members in accordance with its standard policies and practices.

62. Plaintiff is an adequate representative of the Classes because his interests coincide with, and are not antagonistic to, the interests of the members of the Classes he seeks to represent, he has retained counsel competent and experienced in such litigation,

13

and he intends to prosecute this action vigorously. Plaintiff and his Counsel will fairly and adequately protect the interests of members of the Classes.

63. Common questions of law and fact exist as to all members of the Classes. Without limitation, the total focus of the litigation will be Defendant's uniform conduct and procedures, whether Defendant's uniform procedures were reasonable and whether Defendant acted willfully in its failure to (1) implement procedures to ensure that its reporting was accurate and/or (2) reinvestigate disputes. The appropriate amount of statutory and/or punitive damages under the FCRA are common questions as well the scope of any injunctive relief.

64. Questions of law and fact common to the Classes predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA. Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

65. The administration of this action can be handled by class counsel or a third-

party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(On Behalf of Plaintiff and the Reasonable Procedures Class)**

66.     Plaintiff relies on the factual allegations in this Complaint, which are the factual bases of each cause of action herein.

67.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding Plaintiff and each member of the Reasonable Procedures Class.

68.     The foregoing violations were negligent and/or willful. Defendant acted in knowing or reckless disregard of its obligations and the rights of Plaintiff and other Reasonable Procedures Class members under 15 U.S.C. § 1681e(b).

69.     As a result of Defendant's conduct, Plaintiff and Reasonable Procedures Class members suffered actual damages including but not limited to impairment to credit, damage to reputation, emotional distress, and wasted time.

70.     Plaintiff and members of the Reasonable Procedures Class are entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o and 15 U.S.C. § 1681n.

**COUNT II**

### 15 U.S.C. § 1681i
### Failure to Conduct a Reasonable Reinvestigation
### (On Behalf of Plaintiff and the Failure to Reinvestigate Class)

71. Plaintiff relies on the factual allegations in this Complaint, which are the factual bases of each cause of action herein.

72. Defendant violated 15 U.S.C. § 1681i(a) by failing to conduct a reinvestigation to determine if the information it reported was accurate, and by failing to correct inaccurate information for Plaintiff and the members of the Failure to Reinvestigate Class.

73. Defendant was put on notice of the widespread issue with its reporting through consumer disputes yet failed to conduct any meaningful reinvestigation.

74. The foregoing violations were negligent and/or willful. Defendant acted in knowing or reckless disregard of its obligations and the rights of Plaintiff and other Failure to Reinvestigate Class members under 15 U.S.C. § 1681i(a)(1)(A).

75. As a result of Defendant's conduct, Plaintiff and Failure to Reinvestigate Class members suffered actual damages including but not limited to impairment to credit, damage to reputation, emotional distress, and wasted time.

76. Plaintiff and members of the Failure to Reinvestigate Class are entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o and 15 U.S.C. § 1681n.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Classes, seeks the following

relief:

    a.    Determining that this action may proceed as a class action under Fed. R. Civ. P. 23;

    b.    Designating Plaintiff as the class representative for the Classes;

    c.    Designating Plaintiff's Counsel as counsel for the Classes;

    d.    Issuing proper notice to the Classes at Defendant's expense;

    e.    Declaring that Defendant committed multiple, separate violations of the FCRA;

    f.    Declaring that Defendant acted negligently, willfully, and in deliberate or reckless disregard of the rights of Plaintiff and the Classes under the FCRA;

    g.    Awarding actual and/or statutory damages as provided by the FCRA;

    h.    Awarding punitive damages;

    i.    Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA; and

    j.    Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

## **JURY DEMAND**

Plaintiff, on behalf of himself and the Classes, demands a trial by jury on all issues triable. by a jury.

Dated: June 13, 2024

BERGER MONTAGUE PC

/s/John G. Albanese
E. Michelle Drake, Bar No. 0387366
John G. Albanese, Bar No. 0395882
Ariana B. Kiener, Bar No. 0402365
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.599
F. 612.584.4470
emdrake@bm.net
jalbanese@bm.net
akiener@bm.net

*Attorneys for Plaintiff*